1  GARLAND T. STEPHENS
   MELISSA L. HOTZE (*pro hac vice* application forthcoming)
2  JUSTIN L. CONSTANT (*pro hac vice* application forthcoming)
   RENE E. MAI (304987)
3  WEIL, GOTSHAL & MANGES LLP
   700 Louisiana, Suite 1700
4  Houston, TX  77002
   Telephone:  (713) 546-5000
5  Facsimile:  (713) 224-9511
   garland.stephens@weil.com
6  melissa.hotze@weil.com
   justin.constant@weil.com
7  rene.mai@weil.com
8
   ANNE M. CAPPELLA (181402)
9  WEIL, GOTSHAL & MANGES LLP
   201 Redwood Shores Parkway
10 Redwood Shores, CA 94065
   Telephone: (650) 802-3000
11 Facsimile: (650) 802-3100
   anne.cappella@weil.com
12
13
   *Attorneys for Intel Corporation*
14

15                **IN THE UNITED STATES DISTRICT COURT**

16              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

17                                        CV- 17-80159-MISC.

| | |
|---|---|
| 18  *In Re* **SUBPOENAS TO**<br>**Intel Corporation** | Misc. Case No. 17-MC-80___ |
| 19 | |
| 20  Served in related cases: | **NON-PARTY INTEL CORPORATION'S**<br>**NOTICE OF MOTON AND MOTION** |
| 21  *TQ Delta, LLC. V. ADTRAN, Inc., D. Del. Case*<br>*Nos. 14-cv-00954, 15-cv-00121;* | **TO QUASH TQ DELTA'S SUBPOENA**<br>**FOR DEPOSITION OF INTEL AND**<br>**MEMORANDUM OF POINTS AND** |
| 22 | **AUTHORITIES IN SUPPORT OF NON-**<br>**PARTY INTEL CORPORATION'S** |
| 23  *TQ Delta, LLC v. Zhone Technologies, Inc. D.*<br>*Del. Case No. 13-cv-1836-RGA;* | **MOTION TO QUASH** |
| 24  and | |
| 25 | |
| 26  *TQ Delta, LLC v. ZyXEL Communications, Inc.*<br>*and ZyXEL Communications Corp., D. Del. Case* | |
| 27  *No. 13-cv-02013-RGA* | |
| 28  Served in related cases: | |

---

**INTEL'S MOTION TO QUASH TQ DELTA'S**                                    **CASE NO. 17-MC-80__**
**SUBPOENAS**

1   *In re Subpoenas to Intel Corporation, N. D. Cal.*
    *Case No. 4:17-mc-80099-KAW*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF CONTENTS**

Page

3

I.      NOTICE OF RELATED CASE.................................................................................. 1

4

II.     INTRODUCTION..................................................................................................... 1

5

III.    STATEMENT OF FACTS....................................................................................... 2

6       A.      TQ Delta served these subpoenas more than two years after the Intel
                products were identified in the Delaware Actions ................................................... 2
7
        B.      The subpoenas include overly broad and burdensome topics that seek
8               testimony that is (i) not relevant or marginally relevant and not tailored to
                the needs of the Delaware Actions, (ii) privileged, (iii) available from other
9               sources including parties, and (iv) otherwise improper ......................................... 3

10      C.      A Motion for Summary Judgment that Lantiq's products are licensed is
                currently pending in Delaware ............................................................................... 4
11
        D.      Intel met and conferred with TQ Delta in an attempt to resolve the dispute .......... 4
12

13      IV.     ARGUMENT .......................................................................................................... 5

14      A.      The subpoenas should be quashed because two subpoenas are moot and the
                pending Motion for Summary Judgment may moot the other two ........................ 5
15
        B.      TQ Delta's deposition subpoenas are overbroad and unduly burdensome,
16              request irrelevant or marginally relevant information, and are duplicative of
                other discovery ..................................................................................................... 6
17
        C.      TQ Delta's deposition subpoena seeks privileged information ........................... 14
18
        D.      If the Court does not quash TQ Delta's subpoenas in their entirety, TQ
19              Delta should pay Intel's costs for complying with the subpoenas ....................... 17

20      V.      CONCLUSION ...................................................................................................... 18

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Eagle Outfitters, Inc. v. Payless ShoeSource, Inc.*,
  No. CV 07-1675 ERK VVP, 2009 WL 3786210 (E.D.N.Y. Nov. 12, 2009) .............................16

*AngioScore, Inc. v. TriReme Med., Inc.*,
  No. 12-CV-03393-YGR JSC, 2014 WL 6706873 (N.D. Cal. Nov. 25, 2014) ............6, 7, 14, 15

*Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*,
  319 F.R.D. 277 (N.D. Cal. Mar. 13, 2017) ...............................................................................17

*Callwave Communications, LLC v. Wavemarket, Inc.*,
  No. C 14-80112 JSW (LB), 2015 WL 831539 (N.D. Cal. Feb. 23, 2015) ..........................16, 17

*Exxon Shipping Co. v. U.S. Dep't of Interior*,
  34 F.3d 774 (9th Cir. 1994)........................................................................................................7

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
  161 F.R.D. 86 (N.D. Cal. 1995) .................................................................................................5

*Intermarine, LLC v. Spliethoff Bevrachtingskantoor, B.V.*,
  123 F. Supp. 3d 1215 (N.D. Cal. 2015) ................................................................................5, 11

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)................................................................................................13

*Moon v. SCP Pool Corp.*,
  232 F.R.D. 633 (C.D. Cal. 2005) ...............................................................................................6

*Mount Hope Church v. Bash Back!*,
  705 F.3d 418 (9th Cir. 2012)......................................................................................................7

*Nidec Corp. v. Victor Co. of Japan*,
  249 F.R.D. 575 (N.D. Cal. 2007) ........................................................................................16, 17

*Straight Path IP Grp, Inc. v. Blackberry Ltd*,
  No. C 14-80150 WHA, 2014 WL 3401723 (N.D. Cal. July 8, 2014)............................7, 8, 9, 10

*TWM Mfg. Co., Inc. v. Dura Corp.*,
  789 F.2d 895 (Fed. Cir. 1986)..................................................................................................13

*U.S. v. Bergonzi*,
  216 F.R.D. 487 (N.D. Cal. 2003) ..............................................................................................16

*U.S. v. Zolin*,
  809 F.2d 1411 (9th Cir. 1987) (overruled on other grounds by *U.S. v. Jose*, 131
  F.3d 1325 (9th Cir. 1997)) ............................................................................................16, 17

**Other Authorities**

Dkt. No. 1 in *In re Subpoenas to Intel Corporation*,
  Case No. 17-mc-80099.................................................................................................2, 3

Dkt. No. 1-10 at RFP 18 in *In re Subpoenas to Intel Corporation*,
  Case No. 17-mc-80099......................................................................................................15

Dkt. No. 1-2 at 2-3 in *In re Subpoenas to Intel Corporation*,
  Case No. 17-mc-80099........................................................................................................2

Dkt. No. 1-8 in *In re Subpoenas to Intel Corporation*,
  Case No. 17-mc-80099......................................................................................................15

Dkt. No. 112 in *TQ Delta, LLC. v. ADTRAN, Inc.*,
  D. Del. Case Nos. 14-cv-00954............................................................................................6

Dkt. No. 14-4 at 16-17 in *In re Subpoenas to Intel Corporation*,
  Case No. 17-mc-80099......................................................................................................15

Dkt. No. 14-4 in *In re Subpoenas to Intel Corporation*,
  Case No. 17-mc-80099........................................................................................................3

Dkt. No. 22-4 ¶¶ 2 and 5-6 in *In re Subpoenas to Intel Corporation*,
  17-mc-80099 ........................................................................................................................7

Dkt. No. 22-4 ¶ 5 in *In re Subpoenas to Intel Corporation*,
  17-mc-80099 ........................................................................................................................4

Dkt. No. 22-6 in *In re Subpoenas to Intel Corporation*,
  Case No. 17-mc-80099......................................................................................................14

Dkt. No. 22-8 ¶¶ 16, 18, 22-23 and Ex. 2 in *In re Subpoenas to Intel Corporation*,
  17-mc-80099 ........................................................................................................................9

Dkt. No. 240 in *TQ Delta v. ADTRAN, Inc.*,
  cases C.A. Nos. 14-cv-00954 and 15-cv-00121.................................................................4, 10

Dkt. No. 33-4 at 1 in *In re Subpoenas to Intel Corporation*,
  Case No. 17-mc-80099......................................................................................................10

Dkt. No. 36 in *TQ Delta v. ADTRAN, Inc.*,
  cases C.A. Nos. 14-cv-00954 and 15-cv-00121.....................................................................3

Dkt. No. 374 in *TQ Delta, LLC v. Zhone Technologies, Inc.*,
  D. Del. Case No. 13-cv-01836 .............................................................................................6

Dkt. No. 66 in *TQ Delta v. ADTRAN, Inc.*,
cases C.A. Nos. 14-cv-00954 at 15-cv-00121 .............................................................................. 3

Dkt. No. 91 in *TQ Delta v. ADTRAN, Inc.*,
cases C.A. Nos. 14-cv-00954 and 15-cv-00121 ......................................................................... 3

Dkt. No. 95 at 59:3-5 in *TQ Delta, LLC v. 2Wire, Inc.*,
D. Del. Case No. 13-cv-1835 ....................................................................................................... 6

Fed. R. Civ. P. 26(b)(1) ................................................................................................................. 8

Fed. R. Civ. P. 26(b)(2)(C) ........................................................................................................... 5

Fed. R. Civ. P. 45(d)(1) ........................................................................................................... 2, 17

Fed. R. Civ. P. 45(d)(3)(A) ........................................................................................................... 5

*In re Subpoenas to Intel Corporation*,
Case No. 17-mc-80099 ............................................................................................................... 14

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Please take notice that on January 18, 2018, or as soon thereafter as this matter may be heard, in the courtroom of the Honorable Judge Kandis A. Westmore, located at 1301 Clay Street, Oakland, CA 94612 resident and non-party Intel Corporation ("Intel") will and does move this Court for an order quashing the Subpoenas to Testify at Deposition in a Civil Action served upon it by Plaintiff TQ Delta, LLC ("TQ Delta") in *TQ Delta, LLC v. 2Wire, Inc.*, D. Del. Case No. 13-cv-1835; *TQ Delta, LLC. v. ADTRAN, Inc., D. Del. Case Nos. 14-cv-00954, 15-cv-00121*; *TQ Delta, LLC v. Zhone Technologies, Inc. D. Del. Case No. 13-cv-1836-RGA* (now dismissed); and *TQ Delta, LLC v. ZyXEL Communications, Inc. and ZyXEL Communications Corp., D. Del. Case No. 13-cv-02013-RGA*, pending in the United States District Court for the District of Delaware.

Intel makes this motion pursuant to this Notice of Motion, Motion and Memorandum of. Points and Authorities, and Declarations of Rene Mai and Rudi Frenzel in Support thereof, filed concurrently; the files and records in this case; and any argument advanced at the hearing on this Motion.

DATED:  December 18, 2017

Weil, Gotshal & Manges LLP

By

Anne M. Cappella (181402)

Attorney for Non-Party
Intel Corporation

## MEMORANDUM AND POINTS OF AUTHORITIES

**I.   NOTICE OF RELATED CASE**

This motion is related to TQ Delta, LLC's ("TQ Delta") Motion to Compel Intel, *In re Subpoenas to Intel Corporation, N. D. Cal. Case No. 4:17-mc-80099-KAW*.  Additionally, this case stems from TQ Delta's patent infringement lawsuits filed in the District of Delaware, *TQ Delta, LLC v. 2Wire, Inc.*, D. Del. Case No. 13-cv-1835; *TQ Delta, LLC. v. ADTRAN, Inc., D. Del. Case Nos. 14-cv-00954, 15-cv-00121*; *TQ Delta, LLC v. Zhone Technologies, Inc. D. Del. Case No. 13-cv-1836-RGA* (now dismissed); and *TQ Delta, LLC v. ZyXEL Communications, Inc. and ZyXEL Communications Corp., D. Del. Case No. 13-cv-02013-RGA*.

**II.   INTRODUCTION**

By this motion, Intel moves to quash four identical deposition subpoenas served by TQ Delta on Intel in connection with four separate patent infringement cases in Delaware to which Intel is not a party (listed above, collectively called the "Delaware Actions").  Two of these subpoenas should be quashed because they are now moot—one of the cases was dismissed, and in the second no Intel products are at issue.  The remaining two subpoenas should be quashed because they too may shortly be moot in light of a pending Summary Judgment Motion filed by one of the Defendants.  Even if not moot, the subpoenas are overly broad and unduly burdensome, duplicative of the documents and declarations Intel has already provided, marginally relevant, and seek privileged information.

In *TQ Delta v. ADTRAN*, the parties have completed briefing on a summary judgment motion that ADTRAN is licensed to the asserted patents by virtue of a license between ADTRAN's supplier, Intel's German subsidiary Lantiq, and the original owner of the Patents-in-Suit.  If the motion for summary judgment is granted, it will eliminate any need for discovery relating to the accused Lantiq chips.  Intel respectfully requests that these subpoenas be quashed at least until this summary judgment motion is decided by the Delaware Court.

In any event, the subpoenas are improper and should be quashed entirely.  The subpoena deposition topics are facially overly broad and unduly burdensome—identifying categories of information not reasonably tailored to the needs of the Delaware Actions (*e.g.,* all source code

1    produced whether or not related to the accused features). TQ Delta has made no attempt to reduce

2    the burden of its subpoenas on Intel (*e.g.,* despite Intel's offer to authenticate relevant documents,

3    TQ Delta continues to seek testimony authenticating all of the 90,000 pages of documents that

4    Intel produced in response to prior subpoenas). In many cases, TQ Delta's topics improperly seek

5    to shift its burden of analyzing evidence concerning the accused products to Intel.

6          TQ Delta has ignored its obligation under Fed. R. Civ. P. 45(d)(1) to avoid imposing undue

7    burden or expense, both in the present subpoenas for testimony and in TQ Delta's equally

8    unreasonably burdensome document subpoenas that are presently the subject of a motion to

9    compel in this Court. *In re Subpoenas to Intel Corporation*, Case No. 17-mc-80099, Dkt. No.1.

10   Intel sought to narrow the scope of these subpoenas by meeting and conferring with TQ Delta, but

11   TQ Delta refused to propose or accept any narrower scope. Should the Court allow TQ Delta to

12   proceed with any depositions pursuant to these subpoenas, Intel respectfully requests that the

13   Court shift the cost of Intel's compliance to TQ Delta and that depositions occur in the country of

14   residence of the witness.

15   **III.    STATEMENT OF FACTS**

16          **A.    TQ Delta served these subpoenas more than two years after the Intel products
              were identified in the Delaware Actions**

17

18          Intel is not a party to the Delaware Actions, which TQ Delta filed more than three years

19   ago. Dkt. No. 1-2 at 2-3 in *In re Subpoenas to Intel Corporation,* 17-mc-80099; *see also* § I

20   Notice of Related Cases, *supra*. In the Delaware Actions, TQ Delta accuses products compliant

21   with several digital subscriber line ("DSL") standards of infringing 38 patents. *Id.* DSL uses

22   digital encoding to provide high-speed data transmission over existing copper wire telephone

23   lines. Intel's German subsidiary, Lantiq, makes DSL chips that are used in some of the accused

24   products sold by ADTRAN, Zhone, and ZyXEL. Intel is only one of several manufacturers that

25   supply chips to some of the defendants; the other suppliers include at least Qualcomm, Broadcom,

26   Ikanos, and Actiontec. Unlike some of the other suppliers, DSL is not part of Intel's core

27

28

1   business. Intel's wholly-owned German subsidiary Lantiq[1] produces all of the DSL chips for

2   which TQ Delta seeks testimony.

3         In May 2015, ADTRAN, Zhone, 2Wire and ZyXEL each disclosed to TQ Delta the

4   specific DSL chipsets used in the accused products. *See* Dkt. No. 36[2] in *TQ Delta v. ADTRAN,*

5   *Inc.*, cases C.A. Nos. 14-cv-00954 and 15-cv-00121.   TQ Delta served broad document subpoenas

6   on Intel in the *ADTRAN, Zhone* and *Zyxel* cases six months later, in January 2016. *Id.*, Dkt. No.

7   66.   Over the course of a year and half of meeting and conferring with TQ Delta, Intel repeatedly

8   searched for documents, including on archived Lantiq servers. Dkt. No. 14-4 in *In re Subpoenas*

9   *to Intel Corporation,* Case No. 17-mc-80099.   Intel has produced more than 90,000 pages of

10   documents and 33,000 source code files.   *Id.*   TQ Delta has filed a motion to compel on those

11   document subpoenas, which is currently pending in this Court. Dkt. No. 1 in *In re Subpoenas to*

12   *Intel Corporation,* Case No. 17-mc-80099.

13         After multiple extensions, TQ Delta served its final Lantiq-based infringement contentions

14   in December 2016. Dkt. No. 91 in *TQ Delta v. ADTRAN, Inc.*, cases C.A. Nos. 14-cv-00954 and

15   15-cv-00121.   In those contentions, TQ Delta identified Lantiq-based accused products only in the

16   *ADTRAN* and *ZyXEL* cases.   Nevertheless, TQ Delta served the present deposition subpoenas on

17   Intel in November 2017 in all four cases.

18       **B.**    **The subpoenas include overly broad and burdensome topics that seek**

19             **testimony that is (i) not relevant or marginally relevant and not tailored to the**
          **needs of the Delaware Actions, (ii) privileged, (iii) available from other sources**

20             **including parties, and (iv) otherwise improper**

21         TQ Delta's subpoenas seek testimony in seven broad categories (some topics fall into more

22   than one category): (1) Intel's document collection and production in response to TQ Delta's

23   document subpoenas (Topic Nos. 1, 2, 3, 6 and 28);   (2) common-interest privileged

24   communications with the defendants in the Delaware Actions, (Topic Nos. 3, 4, 25, 26 and 27);

25   (3) Intel sales and indemnity agreements including (but not limited to) with defendants (Topic

---

[1] Intel purchased Lantiq in 2015, and Lantiq is now part of the Connected Home Division of Intel.
Dkt. No. 22-4 ¶ 2 in *In re Subpoenas to Intel Corporation*, 17-mc-80099.

[2] For convenience, all citations in the ADTRAN case are made to the docket numbers in case C.A.
No. 14-cv-00954.

1   Nos. 19, 20 and 25); (4) documents made available to or accessed by the defendants (Topic Nos. 5

2   and 15); (5) Lantiq financial information (Topic Nos. 16, 17, and 18); (6) Lantiq license

3   agreements (Topic Nos. 21, 22, 23, and 24); and (7) the operation of Lantiq chips (Topic Nos. 7-

4   14), including: a description of how each Identified Chip performs each of the numerous

5   "Specified DSL Standards" and the operation of each of the hundreds of "Identified Intel Source

6   Code Files," and all 33,000 source code files in the 37-page list of source code files.

7       The majority of hardware development for the Identified Chips occurred prior to the

8   formation of Lantiq in 2009 by Infineon or Texas Instruments.  Dkt. No. 22-4 ¶ 5 in *In re*

9   *Subpoenas to Intel Corporation*, 17-mc-80099.  As a result, few if any Intel or Lantiq witnesses

10  possess the knowledge needed to provide the testimony TQ Delta demands.  Frenzel Decl. ¶¶ 5-6.

11      **C.    A Motion for Summary Judgment that Lantiq's products are licensed is
          currently pending in Delaware**

12

13      Between 1999 and 2009, Intel's German subsidiary, Lantiq, and its predecessors, Infineon

14  and Siemens, paid the original assignee of the Patents-in-Suit (Aware Inc.) to develop DSL

15  technology for use in Lantiq DSL chips and obtained a royalty-bearing license to any Aware

16  patents covering that DSL technology.  Lantiq purchased Aware's DSL business outright in 2009,

17  renewing its previous patent licenses (the "Lantiq License").  Intel continues to pay royalties on its

18  sales of DSL chips to Aware, specifically including the Lantiq chips in the accused ADTRAN

19  products, under the Lantiq License.

20      TQ Delta purchased the Patents-in-Suit from Aware subject to the Lantiq License in 2012.

21  In its complaints in the Delaware Actions, TQ Delta asserted that products that contain Lantiq

22  DSL chips infringed all Patents-in-Suit.  TQ Delta has since admitted in an interrogatory response

23  that the Lantiq License covers 28 of the 38 Patents-in-Suit.  Upon leave of Court on October 26,

24  2017, defendant ADTRAN filed a motion for summary judgment that the Lantiq License also

25  covers the remaining 10 Patents-in-Suit.  Dkt. No. 240 at 6 in *TQ Delta v. ADTRAN, Inc.*, cases

26  C.A. Nos. 14-cv-00954 and 15-cv-00121.  Briefing was completed on December 13, 2017, before

27  the date of compliance for the present subpoenas.

28      **D.    Intel met and conferred with TQ Delta in an attempt to resolve the dispute**

1    Intel met and conferred with TQ Delta in an attempt to narrow the scope of its deposition

2    request and regarding this motion on Monday, November 13.  Mai Decl. ¶ 4.  At the meet and

3    confer, Intel offered declarations on a reasonably narrow set of topics to provide TQ Delta the

4    information needed for the Delaware Cases.  TQ Delta refused Intel's offer of declarations in lieu

5    of taking depositions.

6    Intel again met and conferred with TQ Delta regarding the scope of TQ Delta's subpoena

7    and this motion on Monday, November 20.  Mai Decl. ¶ 4.  At the meet and confer, Intel offered

8    to promptly identify at least one witness for deposition regarding Intel's knowledge of the

9    structure and operation of the Identified Chips, and to not object to TQ Delta's subpoenas based

10   on the discovery deadlines in the Delaware Actions, if TQ Delta would agree to delay its

11   subpoenas until after ADTRAN's motion for summary judgment was resolved.  TQ Delta refused

12   Intel's offer.

13   Intel remains willing to compromise with TQ Delta to resolve TQ Delta's deposition

14   subpoenas.

15   **IV.    ARGUMENT**

16   Fed. R. Civ. P. 45(d)(3)(A) requires that a court "must quash or modify a subpoena that: (i)

17   fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the

18   geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other

19   protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden."

20   Fed. R. Civ. P. 45(d)(3)(A).   In addition, the court must limit the discovery sought if it is

21   unreasonably duplicative, if it can be obtained from a source that is more convenient or less

22   burdensome, or if the burden of producing it outweighs its likely benefit."  *Id.* (citing Fed. R. Civ.

23   P. 26(b)(2)(C)).

24   Further, "[t]he Ninth Circuit has long held that nonparties subject to discovery requests

25   deserve extra protection from the courts."  *Intermarine, LLC v. Spliethoff Bevrachtingskantoor,*

26   *B.V.*, 123 F. Supp. 3d 1215, 1218-19 (N.D. Cal. 2015) (quoting *High Tech Med. Instrumentation,*

27   *Inc. v. New Image Indus., Inc.*, 161 F.R.D. 86, 88 (N.D. Cal. 1995)).

28   **A.    The subpoenas should be quashed because two subpoenas are moot and the
      pending Motion for Summary Judgment may moot the other two**

1    Two of the TQ Delta subpoenas should be quashed because they are now moot.  One of the

2   cases was recently dismissed (Dkt. No. 374 in *TQ Delta, LLC v. Zhone Technologies, Inc.*, D. Del.

3   Case No. 13-cv-01836), and in the second no Intel products are at issue.  Dkt. No. 95 at 59:3-5 in

4   *TQ Delta, LLC v. 2Wire, Inc.*, D. Del. Case No. 13-cv-1835 (noting only Broadcom and Ikanos

5   chips are involved in the 2Wire case).  The remaining two subpoenas should be quashed because

6   they too may shortly be moot in light of a pending Summary Judgment Motion filed by one of the

7   Defendants.

8    There is a pending motion for summary judgment in the Delaware Actions that may

9   obviate the need for any of the discovery requested in these subpoenas.  The briefing on that

10   motion was completed on December 13, 2017.  This date is months before the May 11, 2018

11   deadline for discovery in the *ADTRAN* case and the April 4, 2018 deadline for discovery in the

12   *ZyXEL* case.  Dkt. No. 112 in *TQ Delta, LLC. v. ADTRAN, Inc.*, D. Del. Case Nos. 14-cv-00954,

13   which are the only cases involving Lantiq chips.  Intel therefore respectfully requests that these

14   subpoenas be quashed at least until that summary judgment motion is resolved.

15    Intel, a third party, has already expended far more than reasonable efforts to provide TQ

16   Delta with discovery, including expansive searching by its German subsidiary Lantiq that included

17   archived servers, production of over 90,000 pages of technical and financial documents, collecting

18   and making available more than 1.8 gigabytes of source code, and providing several declarations

19   explaining how the documents and source code were collected.  If the Court were to quash the

20   subpoenas solely on the basis of the pending summary judgment motion, Intel would not object on

21   the basis of the discovery deadlines to subpoenas served by TQ Delta after a ruling on the

22   summary judgment motion (but would reserve its rights otherwise to object).

23   **B.**    **TQ Delta's deposition subpoenas are overbroad and unduly burdensome,**
        **request irrelevant or marginally relevant information, and are duplicative of**
24        **other discovery**

25    To determine if a subpoena should be quashed, courts "weigh the burden to the

26   subpoenaed party against the value of the information to the serving party."  *AngioScore*, 2014

27   WL 6706873, at *2 (quoting *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005)).

28   The "burden" of a subpoena is measured in terms of the "harms inflicted by complying with the

1   subpoena." *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 428 (9th Cir. 2012).  Courts should

2   quash subpoenas that "request information that is 'wholly irrelevant under any reasonable legal

3   theory'" for "fail[ing] to comply with existing law."  *Id.* "District courts have broad discretion to

4   determine whether a subpoena is unduly burdensome."  *AngioScore, Inc. v. TriReme Med., Inc.*,

5   No. 12-CV-03393-YGR JSC, 2014 WL 6706873, at *2 (N.D. Cal. Nov. 25, 2014) (citing *Exxon*

6   *Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994)).

7       TQ Delta's deposition subpoenas are facially overbroad and unduly burdensome.  Courts

8   have found that such unreasonably broad subpoenas should be quashed as a matter of policy:

9       [t]he swath of the subpoena is so burdensome that it would be bad policy to now
        whittle it back to something narrow and reasonable.  Instead, the baby should go
10      out with the bath water—the entire defective subpoena will be quashed in its
        entirety.  To do otherwise would encourage litigants to demand the moon thinking
11      they can always fall back to something reasonable.  They should be reasonable
        from the start.
12

13  *Straight Path IP Grp, Inc. v. Blackberry Ltd*, No. C 14-80150 WHA, 2014 WL 3401723, at *5

14  (N.D. Cal. July 8, 2014).  The subpoena that merited throwing "the baby [] out with the bath

15  water" contained 47 "massively overbroad" topics served on a third party.  *Id*, at *3 and *5 (N.D.

16  Cal. July 8, 2014) (stating "[i]t is too much to impose a subpoena with 47 overbroad deposition

17  topics (some with sub-parts) on a third party.  Again, in the posture of the instant proceeding,

18  Netflix is a mere third party, not a defendant.").

19      As with *Straight Path*, TQ Delta served third-party Intel with massively overbroad

20  deposition topics that request extensive and detailed testimony about legacy products developed

21  by other companies and acquired by Intel.  As Intel explained in opposition to TQ Delta's motion

22  to compel, the Identified Chips were developed long ago, with much of the development occurring

23  prior to Lantiq's formation in 2009.  Dkt. No. 22-4 ¶¶ 2 and 5-6 in *In re Subpoenas to Intel*

24  *Corporation*, 17-mc-80099.  Because of the Identified Chips' age and complex development

25  history, and the extent and level of detail of the testimony TQ Delta seeks, it is unlikely that

26  anyone currently at Intel, including its German subsidiary Lantiq, has the knowledge necessary to

27  provide the scope of testimony TQ Delta demands. *Id.*

28

---

Any relevance to the issues in the Delaware Actions is outweighed by the burden on Intel and its subsidiary Lantiq. The Federal Rules require that all discovery be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1) aims to discourage discovery overuse, especially as to non-parties. Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note. The discovery TQ Delta demands is clearly not "proportional to the needs of the case." TQ Delta's deposition subpoena seeks testimony about information of, at best, marginal relevance to the Delaware Actions. Moreover, the information is duplicative of source code, documents and declarations Intel has already produced.

### a. The definitions in TQ Delta's deposition subpoenas are overly broad

Many topics are overbroad due to incorporated definitions that exceed any reasonable scope appropriate for the remaining Delaware litigations. For example, TQ Delta defines "Identified Chips" without limiting the definition to chips used in products accused of infringement in the Delaware Actions. Ex. A, p. 3-4 ¶¶ 5, 6, and 9 (defining "Identified Chips" as including "all Intel DSL chips/chipsets . . . provided to [ADTRAN / ZyXEL / Zhone] and/or used in [ADTRAN / ZyXEL / Zhone] products since January 1, 2007."). TQ Delta broadly requests "*all* Intel DSL chips/chipsets" "provided to [ADTRAN / ZyXEL / Zhone] and/or used in [ADTRAN / ZyXEL / Zhone] products since January 1, 2007." *Id.* (emphasis added). This overbroad definition is included in Topics 5-11, 14, 16-17, 20-22, and 24-25 and is, on its own, a basis to quash the subpoenas. Ex. A, Topics 5-11, 14, 16-17, 20-22, and 24-25. *Straight Path*, 2014 WL 3401723, at *4-*5 (granting a motion to quash where the subpoenas included definitions of the products at issue that included non-accused products).

As another example of overly broad definitions, topics 10, 11 and 13 demand testimony about the "Intel Source Code," which comprises more than 33,000 files (1.8 gigabytes) of source code, spanning numerous products. *See, e.g.,* Ex. A, ¶ 13 and Topic 10-13 (defining "Intel Source Code" as "the source code produced by Intel on the Source Code Computer" and referencing that definition). Only a fraction of these more than 33,000 source code files relate to the accused functionality in the case, and testimony on the other files would have little, if any bearing on the issues in the Delaware Actions. This is also a sufficient basis to quash the subpoenas. *See*

1   *Straight Path*, 2014 WL 3401723, at *6 (finding source code document and testimony requests

2   "too oppressive to be enforceable" when coupled with the lengthy definitions and instructions).

3           **b.**     **Topics requesting testimony on DSL and source code functionality are overly broad**

4   Further, with respect to the topics related to the DSL functionality of the Identified Chips

5   (Topic Nos. 7-14), TQ Delta's requests are facially overbroad. Ex. A, Topic Nos. 7-14. For

6   example, Topic 13 states:

7           Topic 13: The DSL features and/or functions each portion of the Intel Source Code

8           implements or is intended to implement.

9   This topic combines the unreasonable overbreadth of TQ Delta's unfocused definition of Intel

10   Source Code with an equally unfocused request for "DSL features and/or functions" and demands

11   that Intel provide witnesses to testify about "DSL features and/or functions" implemented more

12   than 33,000 source code files without regard to whether any such features or functions are at issue

13   in the Delaware Actions. These are complex products, designed by several different entities over

14   many years, and such an overly broad demand is facially unreasonable. If it were even possible,

15   numerous witnesses would be required. *See Straight Path,* 2014 WL3401723, at *4 ("It is also

16   hard to imagine what deponent would be competent to respond to such largely ambiguous topics.

17   Dozens of deponents would be required.")

18   Similarly, Topic 12, which demands testimony concerning the "operation of the Identified

19   Source Code Files" incorporates a list of **517** source code files identified in Appendix A. *See* Ex.

20   A, Topic 12 and Mai Decl. ¶ 5. These source code files have been available for inspection for

21   more than a year, and TQ Delta has printed thousands of pages of source code from these files.

22   (Dkt. Nos. 14-4 at 4 and 22-8 ¶¶ 16, 18, 22-23 and Ex. 2 in *In re Subpoenas to Intel Corporation*,

23   17-mc-80099). TQ Delta and its experts have therefore had ample time to review the code to

24   determine for themselves how this code works. TQ Delta's demand for testimony on this

25   overbroad topic is tantamount to a demand that Intel provide expert testimony. Identifying and

26   preparing witnesses to provide such testimony would be unreasonably time-consuming and

27   burdensome. *Straight Path*, 2014 WL 3401723, at *5.

28

1  Similarly, Topic 10 demands a witness to identify each portion of the 33,000 files of "Intel

2 Source Code" that allow each Identified Chip to perform "each of the Specified DSL Standards."

3 *See* Ex. A, Topic No. 10.   As discussed above, neither the Intel Source Code nor the Identified

4 Chips are limited to products or functions at issue in the Delaware Actions.   Similarly, the

5 definition of "Specified DSL Standards" includes standards for which TQ Delta has admitted

6 Lantiq is licensed, such as ADSL2, ADSL2+, and VDSL2.   Ex. A at 13 (Dkt. No. 240 in *TQ Delta*

7 *v. ADTRAN, Inc.*, cases C.A. Nos. 14-cv-00954 and 15-cv-00121) (quoting an interrogatory

8 response where TQ Delta stated "ADTRAN's Accused Products that use a Lantiq DSL chipset

9 and that implement G.992.3 [ADSL2], G.992.5 [ADSL2+], and/or G.993.2 [VDSL2] are licensed

10 under the [28] TQ Delta patents, but only to the extent of the G.992.3, G.992.5, and/or G.993.2

11 functionality provided by such Lantiq chipset").   This topic therefore demands extensive and

12 burdensome testimony that is not relevant to the claim or defense of any party.   To the extent it

13 encompasses relevant testimony, it improperly demands that Intel provide expert testimony that

14 TQ Delta can and should provide for itself using the information Intel long since produced.

   **c. Topics requesting authentication of the entire production are overly broad**

17  TQ Delta's document collection topics (1, 2, 3, 6 and 28) demand, among other things, a

18 witness to authenticate 90,000 pages of documents produced in response to TQ Delta's document

19 subpoena.   Ex. A, Topic No. 1.   TQ Delta has made no attempt to limit authentication to

20 documents that it may actually use in the Delaware Actions.   *See* Ex. A, Topic 1.   Yet TQ Delta

21 argued to this Court in its pending motion to compel that more than 30,000 of these pages are

22 "mostly marginally-relevant."   Dkt. No. 33-4 at 1 in *In re Subpoenas to Intel Corporation*, Case

23 No. 17-mc-80099.   Courts in this district quash expansive subpoenas that require a deponent to

24 authenticate unidentified documents.   *Straight Path*, 2014 WL 3401723, at *3 (N.D. Cal. July 8,

25 2014) (stating "This is a costly proposal and a weak justification for such an expansive subpoena.

26 Had Straight Path served only a request to authenticate a few dozen specifically identified

27 documents, the subpoena would likely have been enforced.   But the subpoena served was

28 exponentially more burdensome.").   Intel offered to provide a declaration authenticating a

---

1    reasonable number of documents, but TQ Delta declined the offer.  Mai Decl. ¶ 4.  When a

2    company subject to the subpoena has offered a verification of the records, the Federal Rules of

3    Evidence make a deposition unnecessary.  *Intermarine*, 123 F. Supp. 3d at 1217–18 (stating that

4    "Rule 902(11) 'was intended to obviate the need for live witnesses to parade to the stand to

5    support the admission into evidence of business records'").

6       As another example of overly burdensome verification, TQ Delta also asks for a witness to

7    identify and verify whether documents vaguely identified only by 18 broad and open-ended

8    categories are "the most current and accurate technical descriptions of such chips/chipsets that

9    relate to, describe, or specify the DSL functionalities." Ex. A, Topic 6.  The request does not

10   specifically identify any documents at all, much less provide a specific list of documents that TQ

11   Delta intends to actually use in the Delaware Actions.  It is not even clear how to prepare a witness

12   to provide testimony on such a vague and open-ended topic.  It is facially overbroad and

13   unreasonably burdensome, since TQ Delta has made no effort to limit the request to specific,

14   identified documents.

15            **d.**     **Testimony concerning Intel agreements is irrelevant and to the extent**

16                  **found relevant, should be sought from the parties**

17       Topics 19 and 20 demand testimony concerning agreements between Intel or Lantiq and

18   ADTRAN, Zhone or ZyXEL, while topic 25 demands testimony concerning "[a]ny

19   indemnification obligation of Intel regarding the Identified Chips/Chipsets." As an initial matter,

20   all topics relating to Zhone are now moot since they have settled with TQ Delta.

21       Additionally, these topics demand testimony concerning obligations of Intel to indemnify

22   others.  Any Intel indemnity obligation is not relevant to the claim or defense of any party,

23   because it does not make infringement or validity any more or less likely, and does not affect

24   damages.  Further, these topics are not limited to indemnity concerning allegations in the

25   Delaware Actions, and topic 25 is not even limited to indemnity concerning the parties or products

26   at issue in the Delaware Actions.  These topics are therefore also facially overbroad, and seek

27   irrelevant testimony.

28

e. **Testimony concerning Intel information accessed by parties may be taken from parties and is overly broad and burdensome**

Topics 5 and 15 demand testimony concerning Intel or Lantiq documents made available to or accessed by the parties to the Delaware Actions. Both are overly broad and unduly burdensome and in any event, are more appropriately addressed to the parties themselves. Neither topic is limited to documents relating to issues in the underlying litigation, nor has TQ Delta offered any reason why it cannot pursue this testimony, to the extent it is relevant, from the parties.

f. **Relevant financial information and licenses are in TQ Delta's possession and testimony regarding that information would be duplicative**

With respect to the topics related to Intel's financial information and licenses (Topic Nos. 16, 17, and 18 and 21, 22, 23, and 24), the (at best) marginal relevance of any testimony above and beyond the documents Intel has already produced cannot justify the burden of identifying, preparing, and producing witnesses for deposition. For example, Topic 16 states:

> Topic 16: Gross and net sales (in units and dollars), costs, and gross and net profits (actual and forecasted) for Identified Chips/Chipsets, for each calendar quarter from introduction to the present.

Intel long ago provided to TQ Delta the available information on this topic in the form of spreadsheets and related documents, which Intel has offered to authenticate. Mai Decl. ¶ 4. Testimony by an Intel witness would at best be duplicative of the information TQ Delta already possesses, and a needless burden.

Importantly, Lantiq's sales of the Identified Chips are not in at issue in the Delaware Actions, and are at best marginally relevant to the defendants' sales of products containing them. The defendants' own sales records are clearly more reliable sources of information about sales of accused products than Lantiq's chip sales. TQ Delta should pursue such testimony from Defendants, not Intel or its German subsidiary Lantiq.

As another example, Topic 18 asks Intel to provide a deponent to describe the prices, costs, and gross and net profits, both actual and forecasted, of *any* DSL chip sold by Intel anywhere in the world that supports the G.992.3 (ADSL2), G.992.5 (ADSL2+), G.993.2 (VDSL2), G.998.1

1  (ATM Bonding), G.998.2 (Ethernet Bonding), and G.998.4 (Impulse Noise Protection)

2  standards—even if it is not at issue in the Delaware Cases. *See* Ex. A, Topic 18. TQ Delta has

3  conceded that products based on Lantiq chips are licensed under the asserted patents to practice

4  ADSL2, ADSL2+ and VDSL2, and the TQ Delta patents asserted against the bonding and Impulse

5  Noise Protection standards are the subject of ADTRAN's pending motion for summary judgment.

6  Because it includes admittedly licensed products and other products not at issue in the Delaware

7  Actions, it is facially overbroad.

8  Further, as noted, Lantiq's financial data for the Identified Chips was already produced,

9  including prices, costs, and profits. Testimony would at best be duplicative of the information TQ

10  Delta already possesses.

11  Importantly, damages in the Delaware cases are directed to what TQ Delta and the

12  *defendants* would consider a reasonable royalty in a hypothetical negotiation. None of the parties

13  to such a hypothetical negotiation would have access to third party Lantiq's financial information.

14  It is therefore irrelevant. *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 898 (Fed. Cir. 1986);

15  *see also Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

16  Topic 21 states:

17  Topic 21: Each license agreement for which Intel is, or has been, obligated to pay a
   patent license fee or patent royalty for its manufacture or sale of any Identified
18  Chips/Chipsets, and the amount of any such license fee or royalty payment,
   including without limitation as a percentage and/or dollar amount per chip/chipset.
19

20  Intel long ago provided TQ Delta with all responsive license agreements and royalty

21  statements, and offered to authenticate them. Testimony by an Intel witness would at best be

22  duplicative of the information TQ Delta already possesses, and a needless burden. There is no

23  reason to impose that burden on non-party Intel.

24          **g.**    **Intel's actions to collect documents pursuant to TQ Delta's document
   subpoena are not relevant to any claim or defense, and have already
25  been described in a declaration in TQ Delta's pending motion to
   compel**

26  Information about document collection and the organization of documents is not relevant

27  to any claim or defense in the Delaware Actions and the burden of putting up a witness on these

28  topics far outweighs any possible relevance of the information.

For example, although TQ Delta has never complained about the extensive Lantiq source code production, Topic 14 demands a witness to describe the process by which the source code Intel produced is developed, maintained, and updated. *See* Ex. A, Topic 14. The processes used to develop, update, and maintain Lantiq's source code is not relevant to any claim or defense in the Delaware Actions and any relevance is outweighed by the burden on Intel's subsidiary Lantiq. Furthermore, this burden is increased because the witnesses with relevant knowledge are located in Germany, which has requirements for deposition in Germany that TQ Delta cannot circumvent by serving a deposition in the United States.

As a further example, Topics 2 and 28 demand a witness to describe Lantiq's document collection and production process in response to TQ Delta's subpoena for documents, as well as how the documents are stored. Two Lantiq employees previously provided declarations describing the search for technical and financial documents, and the collection and production of technical and financial documents. Dkt. Nos. 22-4 and 22-6 in *In re Subpoenas to Intel Corporation*, Case No. 17-mc-80099 (explaining how Lantiq searched for documents in response to TQ Delta's subpoenas for documents and how the documents Intel produced are stored). The declarations were provided during briefing on TQ Delta's motion to compel Intel to produce more documents. That motion is fully briefed. *See generally In re Subpoenas to Intel Corporation*, Case No. 17-mc-80099. Neither Intel's document storage practices nor the search for documents pursuant to TQ Delta's document subpoena are relevant to any claim or defense of any party in the Delaware Actions. TQ Delta's only possible motive for these deposition topics is re-litigating or expanding TQ Delta's pending motion to compel.

Even if any of the topics in this category were marginally relevant, the burden imposed by TQ Delta's subpoena on a third party is not justified by the minimal value of the information to TQ Delta above the declarations Lantiq has already submitted in response to TQ Delta's motion to compel. The substantial burden of preparing and presenting witnesses for deposition far outweigh the minimal value, if any, of testimony on these topics. *AngioScore*, 2014 WL 6706873, at *2.

**C.     TQ Delta's deposition subpoena seeks privileged information**

1    TQ Delta's deposition subpoena should also be quashed because it includes topics intended

2    to capture privileged information.  Specifically, Topics 3-4 and 26-27 request a deponent to testify

3    about "[c]ommunications" between Intel and ADTRAN, ZyXEL, or Zhone."  Ex. A, Topics 3-4

4    and 26-27.    Topics 26 and 27 go a step further than Topics 3 and 4, specifically requesting

5    communications between "respective counsel" for Intel and ADTRAN, ZyXEL, and Zhone.  *Id.*,

6    Topics 26 and 27.    Each of these topics facially requests information that is protected from

7    disclosure under the common interest doctrine.

8         Furthermore, these topics mirror TQ Delta's requests for production and are the subject of

9    TQ Delta's pending motion to compel.  *See* Dkt. No. 1-8 in *In re Subpoenas to Intel Corporation,*

10   Case No. 17-mc-80099.  For example, Topic 26 in the deposition subpoenas is virtually identical

11   to Request for Production No. 18 in the document subpoenas:

12        Topic 26:    Communications between Intel and ADTRAN or ZyXEL or Zhone
          (including respective counsel) concerning, relating to, or discussing TQ Delta, TQ
13        Delta's patents, or any of the Delaware cases.

14        Request for Production No. 18:  All communications between Intel and ADTRAN
          (including respective counsel for Intel and ADTRAN) concerning, relating to, or
15        discussing TQ Delta, TQ Delta's patents, or this litigation.

16

17   TQ Delta served similar requests for production for ZyXEL and Zhone.[3]  *See* Dkt. Nos. 1-9 and 1-

18   10 at RFP 18 in *In re Subpoenas to Intel Corporation,* Case No. 17-mc-80099.  Even if it were

19   appropriate to obtain these communications (it is not), testimony about such communications

20   would be duplicative of any produced documents themselves.  Furthermore, TQ Delta has already

21   requested these documents in its pending motion to compel.  These deposition subpoenas simply

22   seek a second bite at the apple.

23        As explained in Intel's opposition to TQ Delta's current motion to compel, the common

24   interest doctrine precludes discovery on Topics 3-4 and 26-27.  Dkt. No. 14-4 at 16-17 in *In re*

25   *Subpoenas to Intel Corporation*, Case No. 17-mc-80099.  The common interest doctrine allows

26   individuals and companies to "communicate among themselves and with the separate attorneys on

27

28   _____
     [3] These (and all other) topics are moot as they relate to Zhone, which has settled.

matters of common legal interest, for the purpose of preparing a joint strategy, and the attorney-client privilege will protect those communications to the same extent as it would communications between each client and his own attorney." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007).   Communications are protected by the common interest privilege "where (1) the communication is made by separate parties in the course of a matter of common [legal] interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived."  *Id.* (modifications in original).   There "need not be actual litigation" for the common interest or joint interest privilege to apply.  *Id.*  "The [common interest] privilege does not require a complete unity of interests among the participants, and it may apply where the parties' interests are adverse in substantial respects."  *U.S. v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003). "Even where the non-party who is privy to the attorney-client communications has never been sued on the matter of common interest and faces no immediate liability, it can still be found to have a common interest with the party seeking to protect the communications."  *U.S. v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987) (overruled on other grounds by *U.S. v. Jose*, 131 F.3d 1325, (9th Cir. 1997)).

Communications between Intel and its customers ADTRAN, ZyXEL, or Zhone related to the Delaware Actions are protected from disclosure under the common interest doctrine.  First, the parties have a clear common legal interest, which is showing that ADTRAN, ZyXEL, and Zhone's products that use Lantiq chips do not infringe the Aware patents purchased by TQ Delta.   The common interest in showing that ADTRAN, ZyXEL, and Zhone's products that use Lantiq chips do not infringe the Aware patents exists even when litigation is only threatened.  *Nidec*, 249 F.R.D. at 578.  The parties also have a common legal interest in appropriately deciding which company should pay damages for any infringement without resorting to litigation on the topic. *Callwave Communications, LLC v. Wavemarket, Inc.*, No. C 14-80112 JSW (LB), 2015 WL 831539 at *4 (N.D. Cal. Feb. 23, 2015) (stating that parties which have "negotiated possible indemnification with respect" to patent infringement claims still have a common legal interest in defeating those claims.); *see also Am. Eagle Outfitters, Inc. v. Payless ShoeSource, Inc.*, No. CV 07-1675 ERK VVP, 2009 WL 3786210, at *3 (E.D.N.Y. Nov. 12, 2009) (stating that parties'

1   "common interest is fortified by the indemnification provision in the assignment agreement which

2   requires Jimlar to defend and indemnify Payless with respect to claims by AEO attacking the

3   validity of the assignment of Jimlar's assets to Payless.") The interest in determining which

4   company should pay damages for infringement, without resorting to litigation, exists even if

5   litigation is only threatened. *U.S. v. Zolin*, 809 F.2d 1411, 1417.

6   In summary, any communications between Intel and its defendant customers concerning

7   TQ Delta, its patents, the Delaware cases or any potential indemnity obligation of Intel are in

8   support of "a matter of common [legal] interest" as required by *Nidec*. *Id.; see also Callwave*,

9   2015 WL 831539 at *4 (finding that a non-party and a party to which it may owe indemnity have a

10  common legal "interest in defeating Callwave's claims of patent infringement in the Underlying

11  Litigation.")

12  The common interest privilege therefore protects from disclosure any communications

13  between Intel and its customers ADTRAN, ZyXEL, and Zhone related to TQ Delta, the Delaware

14  litigation, TQ Delta's patents, or any possible indemnity obligations.

15      **D.**    **If the Court does not quash TQ Delta's subpoenas in their entirety, TQ Delta**

16                 **should pay Intel's costs for complying with the subpoenas**

17  Intel respectfully requests that the Court quash these subpoenas because (i) the *Zhone* case

18  has been dismissed; (ii) no Intel or Lantiq chips are at issue in the *2Wire* case; (iii) ADTRAN's

19  pending motion for summary judgment will render discovery of Intel and its German subsidiary

20  Lantiq moot; and (iv) the subpoenas are overly broad, unduly burdensome, more readily answered

21  by parties, seek privileged information, and are otherwise improper.

22  However, should the Court allow TQ Delta to proceed with any depositions pursuant to

23  these subpoenas, Intel respectfully requests that the Court shift the cost of Intel's compliance to

24  TQ Delta. TQ Delta has a duty to protect non-parties from undue burden or expense incurred from

25  complying with subpoenas it issues. Fed. R. Civ. P. 45(d)(1). Failure to protect a nonparty can

26  result in the award of "lost earnings and reasonable attorney's fees." *Id.* Even if a party takes

27  reasonable steps to protect a nonparty from the costs of compliance, a court must "shift a non-

28  party's costs of compliance with a subpoena, if those costs are significant." *Balfour Beatty*

1  *Infrastructure, Inc. v. PB & A, Inc.*, 319 F.R.D. 277, 281 (N.D. Cal. Mar. 13, 2017) (quoting *Legal*

2  *Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013)).  Intel has already spent over a year

3  and a half searching for and providing a dozen-plus productions and extensive source code to TQ

4  Delta. *See* Case No. 17-mc-80099, Dkt. No. 14-4.  Should the Court order Intel to also provide

5  testimony to TQ Delta, the cost of providing that testimony should be shifted to TQ Delta.

6  **V.      CONCLUSION**

7       Intel respectfully requests that the Court quash TQ Delta's subpoenas. Should the Court

8  elect not to quash the subpoenas in their entirety, Intel respectfully requests that, pursuant to Rule

9  45 of the Federal Rules of Civil Procedure, Intel's costs of compliance be shifted to TQ Delta and

10  any depositions of witnesses take place in the countries in which they reside.

12  Dated:  December 18, 2017                          Respectfully submitted,

14                                                    Anne M. Cappella (181402)
15                                                    WEIL, GOTSHAL & MANGES LLP
                                                      201 Redwood Shores Parkway
16                                                    Redwood Shores, CA 94065
                                                      Phone:  (650) 802-3000
17                                                    Fax:  (650) 802-3100
                                                      anne.cappella@weil.com

19                                                    *Attorney for Intel Corporation*