UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE SUBPOENAS TO INTEL CORPORATION

Case No. 4:17-mc-80159-KAW

**ORDER GRANTING IN PART AND DENYING IN PART NON-PARTY INTEL'S MOTION TO QUASH DEPOSITION SUBPOENA**

Re: Dkt. No. 1

On December 18, 2017, non-party Intel Corporation filed a motion to quash compliance with the deposition subpoenas noticed by Plaintiff TQ Delta. (Dkt. No. 1.) The subpoenas were issued in November 2017 in connection with four patent infringement cases pending in the District of Delaware: *TQ Delta, LLC v. Adtran Inc.*, Case Nos. 14-cv-00964-RGA, 15-cv-00121-RGA; *TQ Delta, LLC v. Zhone Technologies, Inc.,* 13-cv-01836-RGA; and *TQ Delta, LLC v. ZyXel Communications, et al.,* 13-cv-02013-RGA. *Id.* at 1.

On February 15, 2018, the Court held a hearing concurrently with TQ Delta's motion to compel in the related case, 17-mc-80099. Having considered the parties' arguments, and for the reasons set forth below, the Court GRANTS IN PART AND DENIES IN PART Defendant's motion to quash.

### I. BACKGROUND

TQ Delta filed complaints against defendants Adtran, Inc., Zhone Technologies, Inc., ZyXEL Communications, Inc., and 2Wire, Inc. ("Defendants") in the District of Delaware, alleging infringement of up to 32 U.S. patents. *See TQ Delta v. Adtran, Inc.*, Case Nos. 14-cv-00954 and 15-cv-00121 ("Adtran case"); *TQ Delta v. Zhone*, Case No. 13-cv-01836 ("Zhone case"); *TQ Delta v. ZyXEL*, Case No. 13-cv-02013 ("ZyXEL case"); and *TQ Delta v. 2Wire, Inc.*,

Case No. 13-cv-01835 (hereinafter collectively referred to as the "Delaware Cases"). The asserted patents and accused products relate to digital subscriber line ("DSL") technology, which is used to provide high-speed broadband Internet access and video services via copper wires of a local telephone network.

The Delaware Defendants make, use, sell, offer for sale, and/or import products that operate in accordance with one or more of the DSL Standards, such as DSL modems, gateways, and routers, and DSLAMs (devices used at a service provider's central office to provide broadband service) (collectively "DSL Products"). TQ Delta has accused Defendants' DSL Products of infringing TQ Delta's patents-in-suit based, in part, on the fact that Defendants' DSL Products perform and/or are capable of performing patented functions related to the DSL Standards.

Defendants' DSL Products include and utilize semiconductor chips or chipsets that are designed to perform at least a portion of the relevant DSL functions of the DSL Products. Some of the chips utilized by Defendants in the Accused Products are manufactured and/or supplied by Lantiq, which Intel purchased in 2015. (Mot. at 3 n. 3.)

In January 2016, TQ Delta served three subpoenas duces tecum (one in each Delaware case) on Intel, seeking specific technical and financial information about the Intel chips that are used in Defendants' accused products ("Identified Chips"). These are the subject to TQ Delta's motion to compel in the related, miscellaneous matter, 17-mc-80099, which was heard concurrently on February 15, 2018. TQ Delta and Intel have been in communication since January 2016, and the parties have entered into a protective order in the Delaware cases. In November 2017, TQ Delta served four identical deposition subpoenas on Intel. (*See* Decl. of Rene E. Mai, "Mai Decl.," Dkt. No. 3 ¶ 4.) The depositions were noticed for December 18, 2017. (Mai Decl., Ex. A.)

On December 18, 2017, Intel filed a motion to quash compliance with the deposition subpoenas. (Mot., Dkt. No. 1.) On January 9, 2018, TQ Delta filed an opposition. (Opp'n, Dkt. No. 10.) On January 23, 2018, Intel filed a reply. (Reply, Dkt. No. 12.)

///

2

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 45 governs discovery propounded by subpoena. The subpoena must state the place where compliance is required, which must be within 100 miles of where the subpoenaed party resides, is employed, or regularly transacts business in person. Fed. R. Civ. P. 45(a)(1)(A)(iii). Rule 45 requires that a subpoena be issued by the court where the underlying action is pending, but that challenges to the subpoena are to be heard by the district court where compliance with the subpoena is required. Fed. R. Civ. P. 45(a)(2), (d)(3)(A).

## III. DISCUSSION

### A. The Subpoenas at Issue

As an initial matter, Intel contends that two subpoenas are moot. (Mot. at 1, 6.) Specifically, the Zhone Technologies subpoena, on the grounds that that case was dismissed, and the 2Wire subpoena, on the grounds that there are no Intel products at issue. *Id.* In its opposition, TQ Delta withdrew the Zhone subpoena, because that case has since settled and has been dismissed. (Opp'n at 5.) With respect to the remaining subpoenas, TQ Delta only seeks a single deposition of Intel to be used in all three cases. *Id.* While TQ Delta acknowledges that 2Wire did not use Intel chips, it believes that some of the information in the subpoena is relevant, such as the financial forecast information, which may be used for the damages calculation. *Id.* Intel objects to the use of its financial information to calculate a 2Wire royalty. (Reply at 4.) While the Court is sympathetic that Intel's testimony may be representative of the industry, its chips were not used by 2Wire. Thus, the 2Wire subpoena is quashed in its entirety.

Intel further argues that the Adtran and ZyXEL subpoenas may be mooted by the pending motions for summary judgment, which are the only remaining cases involving Lantiq chips. (Mot. at 6.) The Court is not persuaded, even given the recent extension of the fact discovery deadline to October 1, 2018. (Opp'n at 2; Dkt. Nos. 60 & 61.) While Intel claims that it would not object to having the discovery go forward after the close of fact discovery should the motions for summary judgment not be granted, as TQ Delta argues, Intel is not a party to the Delaware cases, and, therefore, is not subject to those deadlines. (Mot. at 6; Opp'n at 4 n. 6.) Despite Intel's non-party status, TQ Delta will be relying on evidence in Intel's possession to make their case against the

3

remaining Defendants, could be irreparably injured should if it does not have access to the evidence with sufficient time to amend its infringement contentions in advance of the discovery deadline.

Accordingly, the motion to quash the Adtran and ZyXEL subpoenas is denied, and the order will only address these two remaining subpoenas.

### B. Availability of Intel or Lantiq witness

Intel claims that, since the majority of hardware development for the Identified Chips occurred before the formation of Lantiq in 2009, there are few is any Intel or Lantiq witnesses that possess the knowledge needed to provide the testimony that TQ Delta demands. (Mot. at 4.) In opposition, TQ Delta contends that even if the Identified Chips are "legacy" chips, in that they were developed by other companies, Intel is currently making and selling many of the chips and continues to support them, by debugging problems and providing updates and patches as needed. (Opp'n at 23.) This point is well taken. Moreover, the Court notes that Rudi Frenzel, whose supporting declarations have been provided in connection with both related motions, previously worked at Lantiq from 2009, became the Head of System Technology DSL, and continues to work for Intel since Lantiq's acquisition in 2015. (Opp'n at 24.) Accordingly, the Court is not persuaded by Intel's argument that it does not have a witness available that can be educated to testify to the noticed topics, and denies the motion to quash on those grounds.

### C. Motion to Quash

#### i. Whether the definitions are overbroad.

Intel contends that certain definitions are overbroad, including "'all Intel DSL chips/chipsets' 'provided to [Defendants] and/or used in [Defendants'] products since January 1, 2017." (Mot. at 8.) The Court agrees, and modifies the definition to only those DSL chips/chipsets in Defendants' accused products.

The Court also agrees that the term "Intel Source Code" is overbroad, as it "refers to the source code produced by Intel on the Source Code Computer in response to TQ Delta's Document Subpoenas. (Mot. at 8 (quoting Subpoena, Mai Decl., Ex. A.).) At the hearing, TQ Delta stated that it was only seeking testimony regarding the source code cited in its infringement contentions,

4

which Intel has in its possession. The Court may quash the subpoena on the grounds that it is overbroad, and Intel encourages it to do so citing *Straight Path IP Grp., Inc. v. Blackberry Ltd.*, 2014 WL 3401723, at *5 (N.D. Cal. July 8, 2014). (Mot. at 7.) Indeed, in *Straight Path,* the district court found that "[t]he swath of the subpoena is so burdensome that it would be bad policy to now whittle it back to something narrow and reasonable." 2014 WL 3401723, at *5. Here, however, the Court finds that, while several deposition topics are overbroad, they are not quite as egregious as the topics in *Straight Path.* Furthermore, the parties would be better served through modification in an effort to avoid further motion practice. Notwithstanding, TQ Delta is advised that it should err on the side of specificity going forward, and that the undersigned will be less inclined to modify any future discovery requests.

Accordingly, the Court modifies the subpoenas by limiting the chips to those used in the accused products and the source code to the code cited in TQ Delta's infringement contentions.

### ii. Intel's document collection and production in response to TQ Delta's document subpoenas (Topic Nos. 1, 2, 6, and 28)

Intel objects to any requests that the witness authenticate the documents it has produced. (Mot. at 10.) Instead, Intel has offered to authenticate a "reasonable number of documents, but TQ Delta declined the offer. *Id.* at 11. At the hearing, the Court asked Intel why it would not authenticate all of the documents it has produced. In response, Intel offered to provide a declaration that they were maintained by Intel's systems in the normal course of business. TQ Delta proposed a draft declaration, which Intel objected to. The Court reviewed the declaration and understands Intel's reluctance to sign it, as it states that "the Records were made and kept by Intel, **or one of its predecessors**, in the ordinary course of business." (*See* Draft Decl. ¶ 5 (emphasis added).) As the Court understands, Texas Instruments and Siemens are not predecessors. At first blush, the remaining content of the draft declaration appears reasonable, and Intel should utilize it, perhaps with minor changes, unless there are other portions to which it objects. That said, to obviate Topic 1, Intel is ordered to authenticate all of the documents it has produced by way of declaration in advance of the deposition.

Topic 2 seeks testimony regarding Intel's document collection efforts in response to the

Document Subpoenas. (Subpoena at 9.) While generally reasonable, Intel has already produced the sworn declaration to Rudi Frenzel in connection with the concurrent motion to compel. At the hearing, Intel agreed to produce a supplemental declaration. Accordingly, the motion to quash Topic 2 is granted.

Topic 6 seeks testimony to verify that the produced documents are the most current and most responsive documents for each of the Identified Chips. (Opp'n at 19; Subpoena at 9.) In light of the 90,000 pages produced by Intel, it is reasonable that its corporate witness would be able to clarify which documents were the most current and responsive for each of the 13 chips/chipsets. Thus, the motion to quash Topic 6 is denied.

Topic 28 seeks testimony regarding document management practices, repositories, and recordkeeping, and requests the locations of documents responsive to the Document Subpoenas and the manner of organization. (Subpoena at 13.) The testimony sought is unduly burdensome for the same reasons the motion to compel responses to the related document request was denied. Thus, Topic 28 is quashed.

### iii. Common-interest privileged communications with the Delaware Defendants (Topic Nos. 3, 4, and 26)

Topics 3 and 4 seek testimony regarding communications with Adtran and ZyXEL regarding Intel's response to the present subpoena (Topic 3) and dating back to the first communications regarding the subject litigation (Topic 4). (Subpoena at 9.) Topic 26 seeks testimony regarding communications with Defendants concerning TQ Delta, TQ Delta's patents, or any of the Delaware cases. (Subpoena at 13.) In the concurrent order, the Court found that there may be a common interest privilege, and ordered Intel to produce a privilege log. Thus, at this juncture, TQ Delta may not depose Intel's witness on these topics.

### iv. Intel Sales and Indemnity Agreements with Defendants (Topic Nos. 19, 20, 25, and 27)

Intel argues that it need not provide any testimony concerning indemnity agreements, because it is not relevant to any claim or defense. (Mot. at 11; Subpoena at 12-13.) In Intel's opposition to the motion to compel in the related case, however, it argued that TQ Delta can ask

6

whether Adtran instructed Intel to make products that are compliant with DSL standards is similarly well taken. (Joint Letter at 7.) Intel cannot have it both ways. Accordingly, TQ Delta may ask whether there are indemnity agreements, and when they were entered into, and whether Intel was instructed by Adtran or ZyXEL to make products that were compliant with DSL standards.

### v. Documents made available or accessed by Defendants (Topic Nos. 5 and 15)

Topics 5 and 15 seek testimony regarding documents provided or made available to Defendants. (Subpoena at 9, 12.) Intel moves to quash these topics on the grounds that they are overly broad and unduly burdensome—as they are not limited to the documents relating to issues in the underlying litigation— and are more appropriately addressed to the parties themselves. (Mot. at 12.) In opposition, TQ Delta claims that the testimony would be highly relevant to rebutting that Defendants "[did] not know how their products perform the DSL functions at issue, or whether or not defendants knew and understood that the Intel chips are essential to complying with DSL Standards." (Opp'n at 19.) At the hearing, the Court asked TQ Delta why this information could not be obtained via document subpoena rather than testimony. TQ Delta explained that it was only seeking the documents that customers were given access to via web server that explained how the chips work. As drafted, however, the topics are overbroad. *Straight Path IP Grp., Inc. v. Blackberry Ltd.,* No. C 14-80150 WHA, 2014 WL 3401723, at *3 (N.D. Cal. July 8, 2014) (quashing a similar deposition topic). Moreover, it would be far less burdensome to obtain this information by other means, including document subpoena or from the Delaware Defendants.

Accordingly, Topics 5 and 15 are quashed.

### vi. Lantiq Financial Information (Topic Nos. 16-18)

Topics 16-18 seek testimony pertaining to Lantiq's financial information. (Subpoena at 12.) At the hearing, TQ Delta reiterated that they required this information to calculate damages. In opposition, Intel argued that the forecast information was not made available to Defendants, and Intel already produced its actual sales information. As set forth in the order on the motion to compel, the limited utility of the forecast information does not outweigh the burden imposed by

7

1 the deposition topics.

2 Accordingly, the Court quashes these topics on the grounds that they are unduly
3 burdensome.

#### vii. Lantiq License Agreements (Topic Nos. 19, 21-24)

Intel seeks to quash the topics pertaining to license and royalty agreements on the grounds that the information is duplicative of its prior document production. (*See* Mot. at 13; Subpoena at 12-13.) In opposition, TQ Delta contends that Intel has only produced a few documents that are responsive, so the testimony sought is highly relevant to a royalty calculation, narrow, and not burdensome. (Opp'n at 11.) The Court agrees. Accordingly, the motion to quash as to Topics 19, 21-24 is denied.

#### viii. Operation of Lantiq Chips (Topic Nos. 7-14)

Intel moves to quash the topics relating to the source code on the grounds that it unduly burdensome given the complexity of the products, and even if it were possible, it would require numerous witnesses. (Mot. at 9; Subpoena at 10-11.) Intel further argues that TQ Delta is attempting to improperly demand that Intel provide expert testimony that TQ Delta should be performing itself using the source code already produced. (Mot. at 10.)

In opposition, TQ Delta argues that the subpoenas specifically identified DSL functionality and/or a small set of Identified Intel DSL Chips/Chipsets. (Opp'n at 8.) But Intel, in response to the document subpoenas, dumped a huge amount of source code files, such that "Intel has the ability to identify and verify each portion of its source code that performs the specific DSL Functions that TQ Delta has identified, and thereby limit the deposition topics." *Id.* (emphasis in original.) Indeed, TQ Delta is willing to have Intel reduce the scope of the topics "about the operation of its source code by verifying, before the deposition and in writing, which source code files perform the functions identified in the subpoena topics." (Opp'n at 8-9.) As discussed above, TQ Delta explained at the hearing that it only sought testimony regarding the code cited in its infringement contentions, and the undersigned modified the definition of "Intel Source Code" to the code cited in the ICs. *See* discussion *supra* Part III.C.i.

The Court notes that the operation of the Intel source code is vitally important to the

1 underlying cases, as TQ Delta claims that "the Intel source code performs significant portions of
2 the accused DSL functionality." (Opp'n at 9.)  It is not unreasonable for TQ Delta to depose Intel
3 regarding the source code well before the close of fact discovery in the Delaware cases.  Intel's
4 offer of permitting a technical deposition after a ruling on the summary judgment motions or in
5 September, in the event that the motions are still pending, is unreasonable in light of TQ Delta's
6 reliance on the discovery to amend its infringement contentions well in advance of the fact
7 discovery deadline.

Accordingly, the motion to quash these topics is denied, but the definition of "Intel Source Code" is modified as set forth above.

### D. TQ Delta is not required to pay Intel's costs

In the event that the undersigned does not quash these subpoenas in their entirety, Intel requests that the Court shift the cost of Intel's compliance to TQ Delta. (Mot. at 17.)  Intel cites *Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*, 319 F.R.D. 277, 281 (N.D. Cal. 2017), in support of its argument that costs must be shifted under Federal Rule of Civil Procedure 45(d)(1) "if those costs are significant." (Mot. at 17.) *Balfour Beatty*, however, noted that cost shifting pursuant to Rule 45(d)(1) is discretionary, while, the language quoted, actually pertained to cost shifting under Rule 45(d)(2)(B)(ii). 319 F.R.D. at 281.  Even so, the court found that the determination of whether costs are significant was relative, such that "an expense might be 'significant,' for instance, to a small family-run business, while being 'insignificant' to a global financial institution." *Id.* (citing *United States v. McGraw–Hill Companies, Inc.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014)).  Thus, "courts look to the nonparty's financial ability to bear the costs of production." *See ids.*

Intel is a large, publicly-traded, multinational corporation, which now owns Lantiq.  It is unlikely that the cost of compliance is "significant" to a company of Intel's size.  Even if it was, any cost shifting is discretionary, and, given Intel's financial interest in the underlying litigation, the Court declines to shift any costs of compliance.

///

///

## IV. CONCLUSION

In light of the foregoing, the Court GRANTS IN PART AND DENIES IN PART Intel's motion to quash. Specifically, the 2Wire subpoena is quashed in its entirety, and the Adtran and ZyXEL subpoenas are modified as set forth above.

IT IS SO ORDERED.

Dated: February 23, 2018

KANDIS A. WESTMORE
United States Magistrate Judge